[Cite as *State v. Aikens*, 2016-Ohio-2795.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-T-0124** |
| TYLER AIKENS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2014 CR 149.

Judgment: Affirmed in part; reversed in part and remanded.

*Dennis Watkins,* Trumbull County Prosecutor, and *LuWayne Annos,* Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow,* 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Tyler Aikens, appeals his conviction, following a jury trial, of rape and two counts of gross sexual imposition of a child. At issue is whether appellant's conviction was against the manifest weight of the evidence and whether his sentence was contrary to law. For the reasons that follow, we affirm in part; reverse in part and remand.

**{¶2}** Appellant was charged in a three-count indictment with rape of a child under the age of 13 by purposely compelling the victim to submit by force or threat of force, in violation of R.C. 2907.02(A)(1)(b) and (B) and R.C. 2971.03(B)(1)(C ), a felony of the first degree (Count 1), and two counts of gross sexual imposition of the same child, in violation of R.C. 2907.05(A)(4) and (C), each being a felony of the third degree (Counts 2 and 3). Appellant pled not guilty and the case was tried to a jury.

**{¶3}** E.D., who at the time of the incident was 10 years old, testified he lives with his mother, B.R.; her boyfriend; and E.D.'s two younger brothers. He said that on a Saturday evening in November 2013, just before Thanksgiving, his mother dropped him and his brothers off and left them with Jason Duffy, a family friend, at a house in Warren, which Jason shared with appellant, his lover; appellant's brother, Zachary Aikens; and their father, David Aikens. B.R. asked Jason to babysit her children because she was going to clean the house of an elderly friend. Jason, appellant, and Zach were at the house that evening, but David was not. Unknown to B.R., appellant took charge of her three boys.

**{¶4}** E.D. said appellant took him and his two brothers into appellant's father's bedroom to watch movies. Appellant crawled into his father's bed with the three boys and got under the covers with them. Appellant was shirtless and only wearing undershorts. The two younger boys were on one side of the bed and E.D. and appellant were next to each other on the other side. While watching a movie, the two younger boys fell asleep.

**{¶5}** E.D. said that while they watched the movie, appellant turned toward him and put his hand on E.D.'s stomach. Appellant then moved his hand down and under

2

E.D.'s shorts and touched his penis. Appellant moved his hand away briefly and then touched E.D.'s penis again. He then grabbed E.D.'s penis and moved it back and forth. E.D. testified he did not say anything because he was "frozen" with fear.

{¶6} Suddenly, Zach walked into the room and appellant jumped and moved his hand away from E.D.

{¶7} After Zach left, appellant grabbed E.D.'s penis again and started moving it back and forth. A short time later, appellant's boyfriend, Jason, opened the door and talked to appellant for awhile.

{¶8} After Jason left the room, appellant pulled down his shorts and turned over toward E.D. Appellant told E.D. to grab his penis and, using his own penis, showed E.D. how to do it. E.D. said appellant "made" him touch it. E.D. said he moved appellant's penis back and forth, just like appellant told him to do, until a "clear fluid" came out of appellant's penis.

{¶9} E.D. said that while appellant was trying to wipe the fluid off the sheet, some of it got on appellant's finger. He told E.D. to "lick it." E.D. said "no," and appellant then licked it off his own finger.

{¶10} E.D. said appellant then put his head under the covers; pulled E.D.'s shorts off; put E.D.'s penis "all the way" in his mouth; and sucked on it for about five minutes. E.D. said he was so afraid he could not say anything.

{¶11} Suddenly, E.D. heard his mother come into the house. Appellant took off the covers and jumped up. He pulled up his shorts and put on his pants. He woke E.D.'s brothers. As they were walking out of the bedroom, appellant told E.D., "don't tell

or I'll get in trouble" and to "keep your mouth shut." E.D. said he did not say anything to anyone about what appellant did because he did not know if appellant would hurt him.

{¶12} E.D. said about one month later, near the end of December 2013, he, Jason, and appellant went to their church for a vacation Bible study. During a break in the Bible class, E.D. burped in response to another child burping and appellant told E.D. that was disgusting. Appellant took E.D. into a room and struck him in the back of his head. E.D. started crying and appellant walked out of the room. Jason then came in the room and asked E.D. what happened. E.D. said that appellant hit him.

{¶13} E.D. said that on the next day, appellant told Jason what happened between them in the bedroom and Jason telephoned E.D.'s mother and told her about it. He said his mother called him into the room. She said that Jason had just called, and she wanted to know what happened with him and appellant. E.D. said he told his mother everything that happened, except for appellant's sucking his penis because he was afraid she would "flip out" since she was crying and already very upset.

{¶14} E.D. said that later that day, he, his mother, and the pastor of their church, "Pastor Ray," went to the police station. E.D.'s mother made a report.

{¶15} E.D. said that a few days later, he met a woman from Children Services and told her what appellant did to him. E.D. was also examined by a doctor.

{¶16} E.D. said that after this incident, he had nightmares. Each time he would wake up screaming and have bad headaches.

{¶17} Sometime later, E.D.'s mother took him back to the police station. E.D. talked to a detective and gave a statement.

4

{¶18} B.R., E.D.'s mother, testified that the first time she learned anything about this incident was on Saturday, December 28, 2013. She said Jason called her saying that she should talk to E.D. because he thought that appellant had done something sexual to him. B.R. started crying and "freaked out." She called E.D. into the room; told him about the call from Jason; and asked him what happened. E.D. said appellant put his hand down his pants and then made E.D. put his hand on appellant's penis and masturbate him. He said that appellant ejaculated and told E.D. to eat his semen. She said E.D. told her everything appellant did except for appellant sucking his penis, which, she said, she learned five days later on January 2, 2014, when the Children Services caseworker interviewed E.D. at the Child Advocacy Center in Boardman.

{¶19} B.R. said that on the same day E.D. told her about the abuse, she took him to the Warren Police Department. She also called her pastor, who met her and E.D. at the station. She reported the abuse to an officer.

{¶20} B.R. said she took this "real hard." She said she stopped talking completely for four to five months. She could not eat and lost a lot of weight. Ultimately, she had a nervous breakdown and was hospitalized for one month.

{¶21} B.R. said that after E.D. reported the abuse, he had migraine headaches. He also had nightmares during which he would scream and cry. E.D.'s pediatrician diagnosed him as having post-traumatic stress disorder and prescribed medication for him. E.D. was in therapy with a counselor for two months. He has to be regularly tested for one year for A.I.D.S.

**{¶22}** Zach Aikens, appellant's brother, testified that on the night in question, he was at home. He said that appellant was in his father's bedroom alone with the three children for about three hours watching movies.

**{¶23}** Zach said that he went into the room to get cigarettes and when he did, appellant was startled. He said that appellant was in the bed with his shirt off with the three children. He said he could not see what appellant was doing because they were under the covers.

**{¶24}** At the state's request, and without objection by the defense, Jason Duffy was treated as a court witness and thus subject to cross-examination by both parties. He testified that he and appellant have been a couple in a sexual relationship for two years. He said he is still in love with appellant and hopes they can be together again. Jason admitted sending appellant love letters and calling appellant in jail. Jason admitted that they discussed what Jason would say at trial and that he told appellant he would do everything he could to help him.

**{¶25}** Jason said that on the night in question, appellant was babysitting B.R.'s children. Appellant was in charge of the children and took them into his father's bedroom to watch movies. Jason said that when he walked into the bedroom, appellant was startled and E.D. appeared to be "puzzled" and "lost." Jason said that appellant's hands were under the blanket and that what appellant was doing appeared to be inappropriate.

**{¶26}** With respect to the incident at the church, Jason said that appellant hit E.D. and E.D. was upset. He said E.D. told him that on the night they were watching movies, appellant started touching him. Jason told E.D. to stop telling him about it

6

because he should tell his mother. The next day, Jason called B.R. and told her she needed to talk to E.D. because he, i.e., Jason, believed that something sexual happened with appellant and E.D. Although reluctant to implicate appellant, Jason testified he believes appellant did something sexual with E.D.

{¶27} Jason said that after this incident came to light, appellant decided to move to Dayton. Jason said that before appellant left, he asked appellant what happened between him and E.D. Appellant said it was just a "touch feely thing."

{¶28} Jason said that when he and appellant would have sex, appellant would have him eat his semen. He said this was part of their sexual relations.

{¶29} Ray Blasko, pastor at Bolindale Christian Church in Howland, who is referred to as "Pastor Ray," testified he is appellant's and E.D.'s pastor. He said that on Friday morning, December 27, 2013, during a Christmas vacation Bible school, someone reported that appellant hit E.D. and E.D. was very upset. The pastor confronted appellant and told him that he is not to hit anyone at the church. The pastor noticed that E.D. was standing nearby. E.D. was shaking, extremely panicked, and afraid of appellant. The pastor said E.D.'s reaction was disproportionate to just being hit. He said he could understand if E.D. was angry with appellant, but he could not understand why E.D. was so afraid of him.

{¶30} Pastor Ray testified that on the next day, Jason Duffy, another member of the church, called him. Jason said that there was something he was holding back and he needed to tell him. Jason said he had walked in on appellant and E.D. while they were watching a movie. He said that appellant touched the child inappropriately. Jason said he had already talked to B.R. Pastor Ray then called her. B.R. was very upset

and said she just found out about the abuse. She said she was going to the Warren Police Department, and Pastor Ray said he would meet her there.

**{¶31}** Contrary to appellant's statement of the facts, Pastor Ray did not testify that E.D. never mentioned prior to trial that appellant ejaculated or performed fellatio on him. Pastor Ray merely said that E.D. did not mention either event while his mother made her report at the police station. However, the pastor was not present when E.D. disclosed appellant's ejaculation to B.R. on December 28, 2013, or when E.D. reported to Children's Services on January 2, 2014, that appellant performed oral sex on him. Thus, E.D. disclosed all of these events within one month of their occurrence and ten months *before trial*. Further, contrary to appellant's statement of the facts, E.D. *never* said appellant's semen was red. To the contrary, he said it was white and clear. It was B.R., who made this comment to the examining doctor, but, while it is unclear what she was referring to, E.D. never said appellant's semen was red.

**{¶32}** Megan Martin, Trumbull County Children Services caseworker, testified that on December 31, 2013, her office received a report that E.D. had been touched on his private parts by appellant. She said that on January 2, 2014, she interviewed E.D. at the Child Advocacy Center in Boardman. She advised Detective Nicholas Carney of the Warren Police Department, who was assigned to the case, of the interview and he attended and observed the interview through a two-way mirror.

**{¶33}** Ms. Martin said that during her interview with E.D., he disclosed to her the details of the abuse. Ms. Martin made a video recording of her interview with E.D. That video and a 22-page transcription of it were admitted in evidence. E.D. told her he was watching a movie with appellant in appellant's father's bedroom. He said he was in the

same bed with appellant. Appellant put his hand down his pants and touched his penis and then grabbed it. E.D. said that appellant then "made" him touch his penis and move it back and forth until a clear, white fluid came out of his penis and appellant tried to make him eat it. E.D. said that appellant then put his mouth on E.D.'s penis and sucked it. Thus, contrary to appellant's statement of the facts, E.D. did in fact tell Ms. Martin that appellant performed fellatio on him.

{¶34} Dr. John Melville, pediatrician and director of the Child Advocacy Center in Boardman, testified he observed Ms. Martin's interview of E.D. and then conducted a physical exam of the boy. Although, pursuant to CAC's protocol, he did not question E.D. again about the details of the abuse, he was aware of the details before he examined the child. Thus, appellant's statement that E.D. did not report fellatio during the doctor's exam is misleading at best.

{¶35} Dr. Melville said that most children never tell anyone about sexual abuse they have experienced, so that children who report abuse are unusual. Further, he said that children who report abuse generally wait a good period of time before doing so. This is called "delayed disclosure. Dr. Melville also said that when children disclose sexual abuse, they generally first report the least concerning parts of the abuse because they are "testing the water." They want to see if they are going to be believed and protected or if they are going to be in trouble for reporting. He said that more often than not, the child will provide additional detail of the abuse after the counselor has developed a relationship with the child over several weeks. This is referred to as "incremental disclosure."

{¶36} Detective Nicholas Carney of the Warren Police Department testified that on January 2, 2014, he attended and observed the interview of E.D. conducted by Ms. Martin at the Child Advocacy Center. On January 3, 2014, Detective Carney took a statement from Jason Duffy at the police station. On February 21, 2014, Detective Carney learned that appellant had returned from Dayton and was at his father's home in Warren. The detective went to the residence and appellant agreed to be interviewed. Detective Carney drove appellant to the station. After being advised of his Miranda rights, appellant denied having sexual contact with E.D. However, when Detective Carney asked appellant if he would find his semen on appellant's father's bed sheet, appellant said that if he did, "it's because I've had sex on the bed before." After this interview, Detective Carney arrested appellant.

{¶37} Appellant did not testify. Nor did he present any witnesses who disputed any aspect of E.D.'s testimony. Instead, appellant called just two witnesses, his father, David Aikens, and Officer Michael Altiere of the Warren Police Department. Appellant's father said he had no idea what happened that night. While appellant argues the initial police report prepared by Officer Altiere did not mention ejaculation or fellatio, Officer Altiere testified the initial report was just a "preliminary" report based on his "brief interview" with appellant's mother and did not purport to be a complete investigative report.

{¶38} Following the close of the evidence, the jury found appellant guilty of Count 1, rape, and also specifically found that appellant purposely compelled E.D. to submit by force or threat of force. The jury also found appellant guilty of the two counts

of gross sexual imposition, as charged in Counts 2 and 3. The court referred the matter for a presentence investigation.

{¶39} At sentencing, the court sentenced appellant to 25 years to life on Count 1, five years on Count 2, and five years on Count 3. The court ordered the two five-year terms to be served concurrently to each other, but consecutively to the 25-years-to-life sentence on Count 1.

{¶40} Appellant appeals his conviction and sentence, asserting two assignments of error. For his first, he alleges:

{¶41} "The appellant's convictions are against the manifest weight of the evidence."

{¶42} An appellate court reviewing the manifest weight of the evidence observes the entire record; weighs the evidence and all reasonable inferences; and considers the credibility of the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new ordered. *Id.* The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶43} When assessing witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." *Warren v. Simpson*, 11th

11

Dist. Trumbull No. 98-T-0183, 2000 Ohio App. LEXIS 1073, *8 (Mar. 17, 2000). If the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No. 2003-A-0118, 2005-Ohio-5286, ¶33. The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph two of the syllabus. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶44} Appellant argues that his conviction was based solely on E.D.'s testimony. However, that is not accurate because the state presented corroborating evidence. Both appellant's brother (Zach) and lover (Jason) testified they caught appellant, an adult, shirtless, and under the covers with ten-year old E.D., who is not appellant's relative. Both witnesses said that when they entered the room, appellant's hands were under the covers and he was startled. Jason testified that appellant's behavior was inappropriate. Significantly, Jason said that appellant has him do the same thing with his semen as part of their lovemaking that appellant tried to make E.D. do. Further, when Jason confronted appellant shortly after E.D. disclosed the abuse, appellant told him it was just a "touch, feely thing." In addition, Pastor Ray said that E.D.'s fear of appellant at the church was far greater than he would have expected from appellant just hitting the boy. Pastor Ray also said that Jason told him that appellant touched E.D. inappropriately.

{¶45} The state also presented evidence that E.D. exhibited symptoms of being a sexually abused child. E.D. was diagnosed with post-traumatic stress disorder. He also suffered from nightmares and migraine headaches following his disclosure of the abuse. Dr. Melville said that sleep disturbances, nightmares, and crying out in sleep, as experienced by E.D., are commonly exhibited behaviors of child victims of sexual abuse during the first year after their disclosure. Further, Dr. Melville said that anger on the part of the child after the abuse is common. Dr. Melville said that E.D.'s mother told him that E.D. had been quiet and angry since the abuse. She said that E.D. had been drawing skulls and writing that he wanted appellant to be dead. Dr. Melville said that anger is consistent with being a victim of sexual abuse.

{¶46} Appellant also argues that E.D.'s testimony was inconsistent. However, he does not cite even one alleged inconsistency in E.D.'s testimony. It is appellant's responsibility to reference the record to find evidence that supports his argument. App.R. 16(A)(7). This court is not required to comb the record in search of evidence to support his argument. In any event, we observe no material inconsistencies between E.D.'s trial testimony and his lengthy, recorded statement to Ms. Martin of Children Services.

{¶47} Instead of relying on any inconsistencies, appellant appears to be basing this argument on the fact that E.D. waited until December 28, 2013, to tell his mother what happened and did not tell her that appellant performed oral sex on him. However, the state presented expert testimony, which explained why E.D. did not tell his mother about the oral sex component of the abuse. Dr. Melville said this is very common. He explained: "Children * * * are acutely aware of their parents' emotional state and are

13

remarkably protective of their parents. So it's quite common for the child not to disclose all of the issues to the parent and then to tell us more at the CAC than they did to their parent."

**{¶48}** As noted above, appellant presented no witnesses who disputed any part of E.D.'s testimony. Thus, the jury was not required to weigh competing testimony.

**{¶49}** It was for the jury to determine witness credibility. In finding appellant guilty, the jury obviously found E.D.'s testimony credible. In doing so, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's conviction must be reversed.

**{¶50}** Appellant's first assignment of error is overruled.

**{¶51}** For his second and final assigned error, appellant contends:

**{¶52}** "The trial court erred, as a matter of law, by ordering that the sentences for counts two and three run consecutive [sic] to the sentence imposed for count one."

**{¶53}** Appellant argues the trial court failed to make the factual findings necessary to sentence him to consecutive sentences under R.C. 2929.14(C). The state argues that appellant waived the argument because he did not raise the issue below. Because appellant failed to object to the imposition of consecutive sentences at the resentencing hearing, our review is limited to consideration of whether the trial court committed plain error. *State v. Dennison*, 10th Dist. Franklin No. 14AP-486, 2015-Ohio-1135, ¶16. When the record demonstrates that the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, the appellant's sentence is contrary to law and constitutes plain error. *Id.*

14

{¶54} Generally, in reviewing felony sentences, we apply the standard of review set forth in R.C. 2953.08(G)(2). That section directs the appellate court "to review the record, including the findings underlying the sentence" and to modify or vacate the sentence "if it clearly and convincingly finds * * * (a) [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 * * * of the Revised Code * * * [or] (b) [t]hat the sentence is otherwise contrary to law."

{¶55} After the enactment of H.B. 86, which became effective on September 30, 2011, a sentencing court is required to make certain factual findings when imposing consecutive sentences. Pursuant to amended R.C. 2929.14(C)(4), consecutive sentences can be imposed if the court finds: (1) a consecutive sentence is necessary to protect the public from future crime or to punish the offender, and (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. In addition to these two factors, the court must find one of the following three factors:

{¶56} (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing * * *[;]

{¶57} (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses * * * adequately reflects the seriousness of the offender's conduct[; or]

15

**{¶58}** (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶59}** Subsequent to this amendment in the consecutive sentencing law, this court held that R.C. 2929.14(C)(4) requires trial courts to make the foregoing findings when imposing consecutive sentences. *State v. Stalnaker*, 11th Dist. Lake No. 2011-L-151, 2012-Ohio-3028, ¶15 ("H.B. 86 * * * amends R.C. 2929.14 and requires fact finding for consecutive sentences."). However, courts are not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, ¶37.

**{¶60}** While the requirement that fact finding occur was re-enacted by H.B. 86, the requirement that a sentencing court give reasons for imposing consecutive sentences, which existed under former R.C. 2929.19(B)(2), was not re-enacted. *State v. Frasca*, 11th Dist. Trumbull No. 2011-T-0108, 2012-Ohio-3746, ¶57. Thus, a sentencing court is not statutorily required to give reasons for a consecutive sentence. *Id.* "'[I]t is arguably easier to impose consecutive sentences today than it was under former R.C. 2929.14(E)(4) because the revived version did away with the requirement that the court justify its findings by giving reasons for making those findings.'" *State v. Moore*, 11th Dist. Geauga No. 2014-G-3183, 2014-Ohio-5182, ¶24, quoting *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, ¶16.

**{¶61}** The Supreme Court of Ohio in *Bonnell, supra*, stated that a trial court's failure to incorporate the findings required by R.C. 2929.14(C) in the sentencing entry

16

after making those findings at the sentencing hearing does not render the sentence contrary to law. *Id.* at ¶30. Rather, such clerical mistake can be corrected via a nunc pro tunc entry. *Id.* However, the Court said that a trial court's failure to make the findings required by R.C. 2929.14(C)(4) for consecutive sentences at the sentencing hearing makes the sentence contrary to law, requiring the vacation of the sentence and a remand to the trial court for resentencing. *Id.* at ¶36-37.

{¶62} Appellant argues the trial court made no proportionality analysis. We note that the trial court found *in its judgment on sentence* that the harm done in this case was so great that a single term does not adequately reflect the seriousness of his conduct. However, the trial court did not find *during the sentencing hearing* that consecutive sentences are not disproportionate to the seriousness of appellant's conduct. Contrary to the state's argument, this is not simply a case where the trial court failed to give a talismanic incantation of the statutory findings during the sentencing hearing; the court said *nothing* about the proportionality of consecutive sentences to the seriousness of appellant's conduct. For this reason alone, appellant's sentence was contrary to law.

{¶63} Further, appellant argues the trial court did not indicate whether it was relying on subsection (a), (b), or (c) in imposing consecutive sentences. We disagree with this argument because the trial court found that the harm caused to E.D. was "extraordinary." The only subsection to which the degree of harm caused by the offender is pertinent is (b), and the court was thus obviously relying on this subsection in imposing consecutive sentences. However, there are two other elements of this subsection. First, the court is required to find that at least two of the multiple offenses

17

were committed as part of one or more courses of conduct. The trial court made no such finding.

{¶64} Second, the trial court was required to find that the harm caused by two or more of the offender's multiple offenses was so great or unusual that no single prison term for any of the offenses adequately reflects the seriousness of the offender's conduct. While the court made this finding in its sentencing entry, it did not make it during appellant's sentencing hearing.

{¶65} Because the record demonstrates the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on multiple offenses, appellant's sentence is contrary to law and constitutes plain error. We therefore vacate appellant's sentence. On remand, the trial court is instructed to resentence appellant and, if it re-imposes consecutive sentences, to make all necessary statutory findings.

{¶66} Appellant's second assignment of error is sustained.

{¶67} For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.


COLLEEN MARY O'TOOLE, J., concurs,

DIANE V. GRENDELL, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

18

DIANE V. GRENDELL, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶68} I concur in the majority's opinion and judgment as to the disposition of the first assignment of error and in the majority's judgment as to the disposition of the second assignment of error. I dissent from the majority's opinion on the issue of whether the trial court failed to make a finding, at the sentencing hearing, that "no single prison term * * * adequately reflects the seriousness of the offender's conduct."

{¶69} The Ohio Supreme Court has held that a "word-for-word recitation" of the language of the sentencing statutes is not required "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29.

{¶70} At Aikins' sentencing hearing, the trial court found that "the harm done in this case was extraordinary." It can readily be discerned from this language that the court engaged in the correct analysis as to whether a single prison term would reflect the seriousness of his conduct. *Compare Bonnell* at ¶ 33 (reference to Bonnell's "atrocious" criminal record "related to a history of criminal conduct that demonstrated the need for consecutive sentences to protect the public from future crime").

{¶71} For the foregoing reasons, while I concur that the trial court failed to make the required findings with respect to proportionality and Aikins' crimes constituting a course of conduct, I dissent from the conclusion that the court failed to do so with respect to whether a single prison term would be adequate.