[Cite as *State v. Burke*, 2019-Ohio-1951.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

TRUMBULL COUNTY, OHIO


STATE OF OHIO,                                    :        **O P I N I O N**

            Plaintiff-Appellee,           :
                                                           **CASE NOS. 2018-T-0032**
    - vs -                                       :                **2018-T-0035**

AUSTIN TAYLOR BURKE,                       :

            Defendant-Appellant.        :


Criminal Appeals from the Trumbull County Court of Common Pleas.
Case Nos. 2017 CR 00403 & 2017 CR 00541.

Judgment: Affirmed; remanded.


*Dennis Watkins*, Trumbull County Prosecutor; *Christopher Becker* and *Ashleigh Musick*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Rhys B. Cartwright-Jones*, 42 North Phelps Street, Youngstown, OH 44503-1130 (For Defendant-Appellant).


TIMOTHY P. CANNON, J.

{¶1} Appellant, Austin Taylor Burke, appeals from the judgments of conviction issued by the Trumbull County Court of Common Pleas in case Nos. 2017 CR 403 and 2017 CR 541 on March 27, 2018. This consolidated appeal stems from three separate matters: a homicide, an armed robbery, and possession of a deadly weapon while under detention. The issues raised on appeal relate to a motion to suppress evidence, motions to sever offenses for trial, the jury's verdict in case No. 2017 CR 403, and the entry of

sentence in case No. 2017 CR 541. We affirm the trial court's judgments of conviction in both cases and remand case No. 2017 CR 403 for the limited purpose of entering a nunc pro tunc sentencing entry.

## Case No. 2017 CR 403

**{¶2}** On June 12, 2017, 22-year-old Kenneth Brandon Hayes Sample ("Brandon") was reported missing by his parents. That morning, Brandon's car was found abandoned on a bike path in Niles, Ohio. Three days later, on the morning of June 15, 2017, Brandon was found deceased in a remote and densely overgrown area of Bristol Township, Ohio. Following an investigation, on the morning of June 20, 2017, the Warren Police Department issued a murder warrant for the arrest of Austin Taylor Burke ("Austin"), who was 18 years old at the time.

**{¶3}** Shortly after 10:00 p.m. on the night of June 20, 2017, Pizza Joe's restaurant in Cortland, Ohio, was robbed at gunpoint. Within the hour, Austin was discovered at an apartment across the street from Pizza Joe's and gave officers a false name, false birth date, and false telephone number. Austin was arrested for failure to disclose personal information and obstructing official business, as well as the active murder warrant, and was later charged with the armed robbery of Pizza Joe's.

**{¶4}** On June 26, 2017, a Grand Jury indicted Austin on six counts:

(1) Aggravated Murder, an unclassified felony with a firearm specification, in violation of R.C. 2903.01(B)&(F) and R.C. 2941.145;

(2) Aggravated Robbery, a first-degree felony with a firearm specification, in violation of R.C. 2911.01(A)(1)&(C) and R.C. 2941.145;

(3) Tampering with Evidence, a third-degree felony, in violation of R.C. 2921.12(A)(1)&(B);

2

(4) Having Weapons while under Disability, a third-degree felony, in violation of R.C. 2923.13(A)(2)&(B);

(5) Having Weapons while under Disability, a third-degree felony, in violation of R.C. 2923.13(A)(2)&(B); and

(6) Aggravated Robbery, a first-degree felony with a firearm specification, in violation of R.C. 2911.01(A)(1)&(C) and R.C. 2941.145.

**{¶5}** Counts 1, 2, and 4 arose from allegations that on or about June 12, 2017, Austin shot and killed Brandon with a firearm at the end of Peck Leach Road in Bristol and then took Brandon's vehicle, drove it to Niles, and abandoned it on the bike trail. Count 3 was prosecuted on the basis that Austin tampered with evidence related to the homicide. Counts 5 and 6 arose from allegations that on or about June 20, 2017, Austin robbed the Pizza Joe's in Cortland at gunpoint and then hid the firearm in the apartment across the street. At all relevant times, Austin was prohibited by law from having a firearm due to a prior juvenile delinquent adjudication for aggravated burglary. The indictment was designated as case No. 2017 CR 403. Austin pled not guilty and failed to post a $1,000,000.00 bond.

**{¶6}** On October 23, 2017, defense counsel filed a motion to sever the counts related to June 12, 2017, from the counts related to June 20, 2017, for purposes of trial. The state of Ohio opposed the motion. The trial court summarily denied the motion on December 14, 2017.

**{¶7}** On December 28, 2017, defense counsel filed multiple motions to exclude or suppress evidence. The state opposed the motions, and the trial court held a hearing on January 8, 2018. On January 29, 2018, the trial court denied the defense motions.

{¶8} On the first day of trial, March 5, 2018, defense counsel filed a motion to sever Counts 4 and 5 (having weapons while under disability) from the remaining counts in the indictment. The trial court denied the motion, noting that "stipulations regarding such prior convictions are permitted and may minimize any potential prejudicial effect." No such stipulation was offered.

{¶9} The jury trial began with a jury view of the location in Bristol where Brandon's body was found, the location in Niles where Brandon's car was found, the location of a house in Niles where Austin and Brandon were last seen together, the location of the armed robbery in Cortland, and the location of an apartment in Cortland where the firearm was found.

{¶10} At the conclusion of the state's case-in-chief, defense counsel moved for Crim.R. 29 acquittal, which was denied. Defense counsel also renewed its motion to sever the homicide charges from the armed robbery charges and its motion to sever the weapons under disability charges. The renewed motions were denied, and the defense rested.

{¶11} The jury returned a verdict of guilty on all charges and specifications on March 9, 2018. The matter was referred to the adult probation department for a presentence investigation report prior to sentencing.

{¶12} Austin filed a motion for acquittal and a motion for new trial due to the alleged improper joinder of the criminal offenses for trial, pursuant to Criminal Rules 8 and 14, which were opposed by the state and denied by the trial court. The trial court found that Austin failed to demonstrate an affirmative showing of prejudice in having the

4

offenses tried together and noted that the jury was instructed to consider each offense as separate and distinct.

{¶13} The state filed a sentencing memorandum, detailing Austin's criminal and behavioral issues while detained at the Trumbull County Jail, his criminal and juvenile delinquent history, the seriousness of the instant offenses, and his "utter lack of remorse." The state subsequently filed a supplemental memorandum detailing an apparent escape attempt from the jail and requesting a sentence of life imprisonment without the possibility of parole.

{¶14} The sentencing hearing was held on March 27, 2018. Defense counsel requested a sentence of 20 years to life on the aggravated murder charge, to run concurrent with the sentences imposed for the aggravated robbery and weapons under disability charges, plus 9 years on the firearm specifications.

{¶15} The trial court sentenced Austin as follows: Count 1: life imprisonment with parole eligibility after 30 years, plus 3 years mandatory on the firearm specification, to run prior to and consecutive, for a total of 33 years; Count 2: 11 years, concurrent to Count 1, with the firearm specification merged; Counts 3, 4, and 5: 36 months each, concurrent to each other and concurrent to the other counts; Count 6: 11 years, plus 3 years mandatory on the firearm specification, to run prior to and consecutive, for a total of 14 years. Count 6 was ordered to run consecutive to Counts 1-5. A nunc pro tunc entry was issued for the purpose of clarifying for the Ohio Department of Rehabilitation and Correction that Austin's total imprisonment term is 47 years prior to eligibility for parole.

**Case No. 2017 CR 541**

{¶16} While Austin was detained in the Trumbull County Jail on the above charges, he was found in possession of an improvised knife/shank. On August 15, 2017, he was indicted on one count of Possession of a Deadly Weapon while under Detention, a first-degree felony in violation of R.C. 2923.131(B)&(C)(2)(a). The indictment was designated as case No. 2017 CR 541. Austin pled guilty to this charge on February 8, 2018. The plea agreement included waiver of a presentence investigation report and a jointly recommended prison sentence of 3 years, to be imposed consecutive to any sentence imposed under case No. 2017 CR 403.

{¶17} A sentencing hearing was held March 27, 2018. The trial court sentenced Austin to 11 years in prison, to be served consecutive to the sentence imposed in case No. 2017 CR 403. Thus, Austin is currently serving a life sentence with parole eligibility after 58 years in prison.

**Assignments of Error**

{¶18} Austin noticed an appeal from each sentencing entry, which have been consolidated upon request of his appellate counsel. Austin now raises the following five assignments of error for review:

> [1.] The trial court erred in taking evidence of cell tower location data that the state searched and seized without a warrant.
>
> [2.] The trial court erred in hearing a separate unrelated robbery with Burke's murder charge.
>
> [3.] The jury returned a verdict against the manifest weight of the evidence.
>
> [4.] The combined effect of any two or more errors above renders the cause reversible under the cumulative error doctrine.

[5.] The trial court erred in sentencing Burke to maximum consecutive terms of imprisonment as to his weapon-in-detention conviction.

## Motion to Suppress

{¶19} Under his first assignment of error, Austin maintains that the trial court erred in failing to suppress evidence of cell site data information, which was obtained by investigators via Grand Jury Subpoena, but not a warrant, allegedly in contravention of his Fourth Amendment rights.

{¶20} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 (4th Dist.1997).

{¶21} The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**{¶22}** "The Fourth Amendment proscribes all unreasonable searches and seizures. It is a restraint on the government." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶17, citing *United States v. Ross*, 456 U.S. 798, 825 (1982). "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id.*, quoting *Katz v. United States*, 389 U.S. 347, 357 (1967).

**{¶23}** On December 28, 2017, Austin filed a "Motion to Suppress Cell Site Data Information – Unlawful Seizure." Austin asserted the investigating officers violated his Fourth Amendment rights by seizing his cellular telephone records from AT&T and searching data referred to as Historical Precision Location Information ("HPLI") without first obtaining a warrant. The state responded on January 3, 2018, arguing a warrant is not required to obtain HPLI because it is not a search that is protected by the Fourth Amendment. The state submitted that the information was properly obtained from AT&T through a Grand Jury Subpoena.

**{¶24}** The trial court held a hearing on January 8, 2018, during which it ordered the prosecution to provide defense counsel with a copy of the Grand Jury Subpoena used to obtain Austin's HPLI. On January 29, 2018, the trial court denied Austin's motion, stating:

> [I]n order for the Fourth Amendment to protect the seizure of information or property, there must be a legitimate expectation of privacy in such. The Supreme Court 'has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities[.]' *United States v. Miller*, 425 U.S. 435, 443. This includes cell phone providers.

8

There is a core distinction between personal cell phone data held within the confines of the personal device and data or information retained by a cell phone provider. The former may have a privacy interest depending on the circumstances, the latter does not. The Court finds the 'pinging' information and the historical location data retained by the cell phone provider are synonymous with the identity of telephone numbers dialed by a user previously determined to hold no legitimate expectation of privacy. *Smith v. Maryland*, (1979) 442 U.S. 735. The devices and technology may have changed; the ultimate premise and application of such have not.

Therefore, the Court finds since there is no expectation of privacy in either the historical cell phone location information or the pinging information, there is no corresponding right under the Fourth Amendment. The motions to suppress the cell-site data are not well taken and are hereby denied.

{¶25} On June 22, 2018, after the trial court had issued its ruling on Austin's motion to suppress—indeed, after the data was presented to the jury and Austin had been convicted—the United States Supreme Court held that the government's acquisition of these cell site records is, in fact, a search protected by the warrant requirement of the Fourth Amendment. *Carpenter v. United States*, 585 U.S. ___,138 S.Ct. 2206 (2018), syllabus.

{¶26} "Cell-site location information," the descriptive term used in *Carpenter*, may be considered synonymous with "historical precision location information," the term used in the case sub judice. The United States Supreme Court provided a brief explanation of the data at issue: "Cell phones perform their wide and growing variety of functions by continuously connecting to a set of radio antennas called 'cell sites.' Each time a phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). Wireless carriers collect and store this information for their own business purposes." *Id*.

9

{¶27} When cell site location information is obtained by the Government, however, it reveals location points that catalog a person's movements over a period of time: "[t]hey give the Government near perfect surveillance and allow it to travel back in time to retrace a person's whereabouts, subject only to the five-year retention policies of most wireless carriers." *Id.* The Supreme Court held that because "individuals have a reasonable expectation of privacy in the whole of their physical movements[,] [a]llowing government access to cell-site records * * * contravenes that expectation." *Id.* Accordingly, a warrant supported by probable cause is required to obtain such data from an individual's wireless carrier. *Id.*

{¶28} Here, the state concedes that investigators obtained Austin's HPLI from AT&T without a warrant. It maintains there is no exclusionary remedy, however, because the investigators obtained the data via Grand Jury Subpoena in good faith reliance on judicial precedent that existed at the time.

{¶29} The suppression of evidence "'is not an automatic consequence of a Fourth Amendment violation.'" *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶24, quoting *Herring v. United States*, 555 U.S. 135, 137 (2009). "The exclusionary rule is a judicially created remedy for Fourth Amendment violations. The question whether the evidence seized in violation of the Fourth Amendment should be excluded is a separate question from whether the Fourth Amendment was violated." *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶92, citing *United States v. Calandra*, 414 U.S. 338, 348 (1974) and *United States v. Leon*, 468 U.S. 897, 906 (1984).

{¶30} The good-faith exception to the exclusionary rule provides that evidence will not be suppressed "when the police act with an objectively 'reasonable good-faith belief'

10

that their conduct is lawful or when their conduct involves only simple, 'isolated' negligence." *Davis v. United States*, 564 U.S. 229, 238 (2011), quoting *Leon*, *supra*, at 909 and *Herring*, *supra*, at 137. Accordingly, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241.

{¶31} At the time of the search at issue here, *Carpenter* had not yet been decided. The Sixth Circuit's precedent was that individuals "have no such expectation [of privacy] in the locational information" obtained from a wireless carrier. *United States v. Carpenter*, 819 F.3d 880, 888 (6th Cir.2016). Therefore, obtaining such information was not considered a "search" under the Fourth Amendment. *Id.* at 890. *See also State v. Gipson*, 6th Dist. Erie No. E-10-038, 2012-Ohio-515, ¶30-31 (upholding the denial of a motion to suppress cell phone records which "were obtained through a subpoena in a context devoid of an expectation of privacy").

{¶32} Austin has not, and cannot, deny that the investigators who obtained his HPLI from AT&T did so in compliance with binding precedent and with an objectively reasonable good-faith belief that their actions were lawful. "While *Carpenter* is obviously controlling going forward, it can have no effect on [the defendant's] case. The exclusionary rule's 'sole purpose…is to deter future Fourth Amendment violations.'" *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir.2018), quoting *Davis*, *supra*, at 236-237. "About all that exclusion would deter in this case is conscientious police work." *Davis*, *supra*, at 241. *See also United States v. Zodhiates*, 901 F.3d 137, 143-144 (2d Cir.2018) and *United States v. Goldstein*, 914 F.3d 200, 201-202 (3d Cir.2019). Thus, we conclude the good-faith exception to the exclusionary rule applies to Austin's HPLI

that was searched in violation of the Fourth Amendment. The trial court did not err in failing to suppress the evidence.

{¶33} The first assignment of error is without merit.

**Trial Testimony and Other Evidence**

{¶34} To analyze the next three assignments of error it is necessary to thoroughly review the evidence presented at trial. The trial took place approximately nine months after Austin was arrested for Brandon's murder and the armed robbery of Pizza Joe's.

{¶35} At the time of Brandon's death in June 2017, he was living with his parents in Warren, Ohio, and worked at Kraftmaid in Middlefield, Ohio. He was 22 years old. Brandon's father, Kenneth Sample, testified that Brandon used to work as a Corrections Officer with the Department of Youth Services ("DYS") in Massillon, Ohio, from September 2016 until February 2017.

{¶36} On June 11, 2017, around 11:00 p.m., Brandon stopped at home after mowing his grandmother's grass in Bristol Township, Ohio. Brandon told Mr. Sample he was taking his friend, Josh White, home. At the time, Mr. Sample was unaware that Josh was living in Akron, Ohio. That was the last time Mr. Sample saw Brandon alive.

{¶37} Josh and Brandon had been friends since they were around 12 and 13 years old, respectively. Josh was 22 years old at the time of trial. Josh testified that he lived with his mother in Akron but was in the Warren area with Brandon on June 11. Brandon, driving a white Chevrolet Malibu, picked up Josh from a friend's house in Niles around 5:00 or 5:30 p.m. They went to Brandon's grandmother's house in Bristol to mow her grass and then went to a friend's house in Warren to swim. They were there until approximately 11:00 p.m. Josh did not have a driver's license or a car at the time, so

Brandon took Josh back to his home in Akron that night. Josh testified that, on the way to Akron, Brandon said he was going to meet up with Austin, appellant herein, later that night. Brandon told Josh that Austin had offered him a lot of money to do something, but Brandon would not specify what he had to do. Brandon dropped off Josh in Akron around 12:30 a.m. on June 12. That was the last time Josh ever spoke to Brandon.

{¶38} Josh testified that he had never met Austin, but he knew that Brandon had met Austin at DYS, where Brandon used to work. Detectives later confirmed that Brandon worked at DYS while Austin was an inmate. Austin had been adjudicated delinquent for aggravated burglary.

{¶39} Mr. Sample woke up for work around 4:30 a.m. the morning of June 12 and noticed Brandon was not home. He immediately texted Brandon and received a response that said, "I'm on my way home, bro," which Mr. Sample testified was indicative of Brandon's usual responses. Mr. Sample tried calling Brandon's phone numerous times starting around 4:50 a.m., but the calls went straight to voicemail.

{¶40} Brandon was supposed to meet his father at church that evening but did not show up as planned at 5:30 p.m. Mr. Sample contacted the Warren Police Department who entered Brandon into L.E.A.D.S. as a missing person. Mr. Sample then drove to Kraftmaid and waited until Brandon's shift started at 8:00 p.m., but Brandon did not show.

{¶41} Detective John Greaver with the Warren Police Department first became involved with the missing person report the following morning, June 13. He spoke with Brandon's mother, Stephanie Sample, about who Brandon may have been in contact with on June 11. Based on information she provided, some of which she had obtained from Josh, police officers reported to Brandon's grandmother's house in Bristol. Josh testified

13

that he suggested the police should "check the woods behind his grandma's home" because he knew Austin was also from that area and he had a "bad feeling." Detective Greaver reported to Austin's house in Bristol, where the 18-year-old lived with his mother, but no one was home.

{¶42} The 911 center "pinged" Brandon's phone and advised Detective Greaver that the last known location of the phone was in Bristol at 4:38 a.m. on June 12. Mr. Sample accessed Brandon's cell phone account and provided the call and text history to Detective Greaver. Brandon had received a phone call at 1:18 a.m. from what was later determined to be Austin's phone number and had called an Akron number at 2:14 and 2:15 a.m. Detective Greaver testified that the Akron number was never investigated or identified. The text exchange between Mr. Sample and Brandon around 4:40 a.m. was the last activity on Brandon's phone.

{¶43} Also on June 13, Detective Greaver learned from the Niles Police Department that Brandon's white Chevrolet Malibu had been located on a bike path in Niles the morning of June 12. Officer Chris Mannella with the Niles Police Department testified that the vehicle was found abandoned approximately 100-150 yards from the trailhead of the bike path, wedged between a standing tree and a felled tree, around 7:30 a.m. At that time, Brandon had not yet been reported missing. No evidence was recovered from the vehicle. Officer Mannella testified that he did not see any blood or evidence of drugs in the vehicle. None of his reports indicate there was mud on the exterior or interior of the vehicle, but he affirmed some mud on the rear tire is visible in the photographs that were taken when the vehicle was found.

14

{¶44} By this point, there were news and media reports circulating that Brandon was missing and that his car had been located in Niles.

{¶45} Later that day, Detective Greaver met with Austin's ex-girlfriend, Makayla Egbert,[1] at the Niles Police Department. Makayla reported she had received information that Austin killed Brandon, returned to her cousins' house covered in blood, and told one of her cousins that he had set Brandon's head on fire.

{¶46} Makayla reported by phone later that evening that she heard from a friend that Austin dumped Brandon's body on "Hatchet Man Road." Detective Greaver inquired of other officers and learned that the road locally known as "Hatchet Man Road" is located in Bristol. It was originally thought that "Hatchet Man Road" was Hyde Oakfield Road, but when the officers reported there on June 14 they were unable to locate anything. Detective Greaver contacted the Ohio Department of Natural Resources ("ODNR") who said they could show the detectives the exact location of "Hatchet Man Road" the following day.

{¶47} After reaching out to Austin on his cell phone, the officers met Austin at his home in Bristol. Austin told them that on June 11 he was walking home from Willow Lake, which is a couple miles from his home. Brandon stopped and gave him a ride home around 7:30 p.m. Austin said there was another male in the car, maybe named "Josh" or "Tyler," and that they both had heroin. Austin said he did not leave his house that night after Brandon dropped him off.

{¶48} The next morning, June 15, the officers met ODNR personnel at "Hatchet Man Road," which had been determined was Peck Leach Road, a dead-end road in

---

1. Ms. Egbert did not testify at trial. "Makayla" is the spelling of Ms. Egbert's name provided in the transcript. We note, however, that other portions of the record indicate the correct spelling of her name is "Michaela."

15

Bristol. The area was very dry and overgrown. They searched the area and initially saw no signs of Brandon or that he had been there. As they were returning to their vehicles, the officers smelled something decaying. They checked over a small hill, where they observed a deceased body on the ground.

{¶49} Detective David Morris, with the City of Cortland Police Department and Trumbull County Homicide Task Force, was called to photograph the scene and arrived around 11:00 a.m. He testified that the day was dry and very hot, already 80 degrees, but he observed a few mud puddles in a roadway past where the body had been found. The body was found lying face down, already in a state of decomposition, and a shirt was pulled over the head. The clothes on the body were wet, most likely from the decomposition.

{¶50} Detective Morris collected a shoe that was found off the body and matched the shoe still on the body. Detective Greaver testified that the location of the shoe indicated the body may have been moved and dragged over the hill. Detective Morris affirmed, however, that he could not say whether the victim was killed there or transported there, or even whether the victim had been shot.

{¶51} The body was identified as Brandon using dental x-rays. Brandon's cell phone, wallet, and car keys were never recovered. The clothing Brandon was wearing was never tested and was eventually destroyed. No shell casings were ever found at the scene.

{¶52} Dr. Humphrey Germaniuk, the coroner and medical examiner for Trumbull County, performed Brandon's autopsy on June 19, 2017. He also testified as an expert witness in pathology. Dr. Germaniuk testified that x-rays revealed at least one definite

16

gunshot wound to the back of Brandon's head and one probable gunshot wound to the right side of his neck; fragments were visible on the x-ray inside the skull and in the soft tissues of the neck behind the ear. Dr. Germaniuk determined the manner of Brandon's death was homicide. The cause of death was the penetrating gunshot wound to the head.

{¶53} Brandon's body was already in a state of moderate decomposition and covered in maggots. The maggots had consumed much of the skin and most of the brain. In attempting to wash off the maggots, Dr. Germaniuk lost the fragment from the side of the neck. A fragment was removed from the skull, which was later determined to be off-white and non-metallic; it was not consistent with a bullet fragment. Due to the decomposition, Dr. Germaniuk was unable to observe any evidence of close-range firing such as soot or stippling.

{¶54} An entrance wound, one-quarter of an inch in diameter, was visible on the left side of the back of the skull. Dr. Germaniuk suggested that the wound was most likely made by a small caliber bullet, e.g., .32, .25., or .22 caliber. A potential second gunshot wound was visible on the right side of the neck. Dr. Germaniuk did not observe any exit wounds.

{¶55} Dr. Germaniuk further testified that any evidence of the body being dragged or any evidence of a struggle, if either had occurred, was erased by the decompositional changes of the body. He also affirmed there was no evidence that either the body or the clothes had been burned.

{¶56} Detective Greaver interviewed Josh the afternoon after Brandon's body was found. Josh gave a statement that was consistent with his trial testimony regarding his whereabouts and interaction with Brandon on June 11: Brandon picked up Josh in Niles

17

around 5:30 p.m.; they mowed grass at Brandon's grandmother's in Bristol; they went to a friend's house in Warren to swim around 8:30 p.m.; they left her house around 11:00 p.m.; Brandon took Josh home to Akron; on the way there, Brandon said Austin was going to pay him $1,000.00 for his help with something, and Josh told him not to do it. Josh denied that he had ever met Austin or that they had picked up Austin on June 11.

{¶57} During the interview, the detectives noted injuries to Josh's hand. Detective Greaver recollected that Josh had attributed a cut on his finger to working with sheet metal and marks on his knuckles to punching a bedpost. Josh testified that the cut was from a broken beer bottle and the marks on his knuckles were from punching his bed post when he heard that Brandon had passed away. Josh also told detectives and testified that he had never seen Brandon use heroin and did not think he ever would have used heroin.

{¶58} The following day, detectives interviewed Meredith Loges, Austin's girlfriend, and again interviewed Makayla Egbert, Austin's ex-girlfriend. Makayla did not testify at trial.

{¶59} Meredith was 18 years old and Austin's girlfriend at the time of his arrest and trial. According to her trial testimony, they started dating in early June 2017. One night that June, Austin took her to "Hatchet Man Road" in Bristol to look for an abandoned house. Meredith drove, and Austin told her how to get there; Rickey Roupe was also in the car, and Rickey's testimony corroborated that this trip occurred. Austin had told them it was a "scary place" because of a legend that a man killed some people there with a hatchet.

18

{¶60} Over the next few days, the detectives conducted numerous interviews with a group of teenagers and young adults acquainted with Austin. Among those interviewed were Rickey Roupe, Hayle Roupe, Jessica Simms, Deidre Keener, and Nathan Moats. Rickey and Nathan reported to the officers a second time and indicated they had not been truthful in their first interviews.

{¶61} Hayle and Rickey are siblings; Makayla, Austin's ex-girlfriend, is their cousin. Their grandmother, Pam Roupe, owns a home on Mason Street in Niles where Rickey also lives. The Mason Street house is a frequent gathering spot for the young group of friends. All five of them—Rickey, Hayle, Jessica, Deidre, and Nathan—were at the Mason Street house at various times on June 11 and June 12. According to their statements and trial testimony, Austin was also there at different points in time.

{¶62} Deidre Keener was 19 years old at the time of trial. Deidre testified that Austin was at the Mason Street house during the day on June 11, and she heard Austin say he was going to rob somebody for heroin. At some point, Austin left. He returned to the Mason Street house with Brandon around 3:00 or 4:00 a.m. on June 12. Rickey and Nathan were also at the house at that time. Deidre told the police and testified that she saw Brandon sitting in his car in the driveway when Austin came to the door. She did not know who Brandon was at the time but later recognized him when she saw the news reports. She also identified the white Chevrolet Malibu in the photographs from the bike path as the vehicle Austin and Brandon arrived in that night. Deidre did not see either of them using drugs. Over the next couple of days, she saw Austin at the Mason Street house. He was making jokes about dropping a car off on the bike trail. She testified that Austin said he shot Brandon on "Hatchet Man Road."

19

{¶63} Rickey was 14 years old when he was interviewed by the detectives. He initially told the detectives that Austin arrived at the Mason Street house around 3:00 p.m. on June 11, stayed the entire night, and left around 8:00 or 9:00 a.m. on June 12. During a second interview, Rickey told them that Austin arrived at the Mason Street house between 6:00 and 8:00 p.m. on June 11 and left with Nathan Moats around 12:00 or 1:00 a.m. on June 12 after he had fallen asleep. Rickey stated that when Austin returned the next morning, Austin said he shot Brandon in the forehead and buried the body.

{¶64} At trial, Rickey testified that he fell asleep on June 11 around 11:00 p.m. or midnight and that Nathan had *not* left with Austin. Rickey said he slept through the night until Austin woke him up the morning of June 12 around 9:00 a.m. Rickey testified that he was mistaken, not lying, when he told the detectives Nathan had left with Austin, because unbeknownst to Rickey, Nathan had fallen asleep in a different room that night. Rickey did admit lying to the detectives during the first interview when he said Austin never left the house that night. Rickey stated he was initially afraid to tell the truth; he knew Austin was "in the gangs and stuff" and did not want to put his life or his grandmother's life in danger. Rickey also testified that he never saw Brandon that night at the Mason Street house, but that because he was asleep from 11:00 p.m. or 12:00 a.m. until 9:00 a.m. the next morning, he would not have known if Brandon was there during that time. Not that morning, but later, Austin told Rickey that he and Brandon went to "Hatchet Man Road," that he told Brandon to get out of the car and get on his knees, and that he shot and killed Brandon.

{¶65} Nathan Moats was 15 years old when he was interviewed by the detectives. He told the detectives that he stayed overnight at the Mason Street house on June 11

20

and had seen Austin and Brandon there during the early morning hours of June 12. Nathan told the detectives he observed Brandon using heroin, which Brandon said a friend from Akron had left in his car. At trial, Nathan testified that Austin and Brandon arrived at the house around 1:00 or 2:00 a.m. and left around 3:30 or 4:00 a.m. He testified that when Austin returned later that morning, Austin told him and Rickey that he shot Brandon in the head and left him on "Hatchet Man Road." Nathan admitted that, because he had been scared, he did not tell the police what Austin had said about killing Brandon until he was interviewed a second time.

{¶66} Hayle Roupe was 16 years old when she was interviewed by the detectives. She lived four streets away from Mason Street in Niles. Jessica Simms was 22 years old. They were both at the Mason Street house on June 11. Hayle testified that Austin was there most of the day, but he kept leaving and coming back. Hayle and Jessica left the house around midnight.

{¶67} Jessica testified that Austin had said he was going to rob Brandon and kill him. On cross-examination, Jessica explained that Austin did not mention Brandon by name; she figured out it must have been him after seeing the news reports about the car that was found on the bike path. Jessica stated she had seen Brandon in the car in the driveway at the Mason Street house around the time she was leaving.

{¶68} Hayle testified that after that night, Austin kept coming over to the Mason Street house. Jessica testified that "after he had did it, he came back, you know, bragging about it. We thought he was just playing around. You know. And as the article came about his car and as he was missing and stuff," she and Hayle went to the police. Hayle said they told the Niles Police that Austin had a gun at her grandmother's house.

21

{¶69} Hayle testified that Austin later told her, Jessica, and Rickey what happened the night of June 11:

> He came back to the table and he was like bribing [sic] about the situation. That he had shot somebody in the back of the head and he had taken him down Hatchet Man Road and left his body there. He told me that he got him out in the front of the car and he put him on his knees and he told us that Brandon had looked at him and said, 'Please don't do this. I have a family. I have – I have a life in front of me.' And he said that he couldn't – he couldn't just sit there and look at him no more, time was over, he had to do it. So he shot him. And he said that the car – he took the car from Hatchet Man Road and that it was running out of gas. He had nowhere else to put it. And that's when he had left it on the Niles bike trail.

Hayle said Austin was not upset when he told them what happened, that he was bragging about it. She also testified that Rickey told them Austin had blood all over him when he came back to the house the next morning.

{¶70} Jessica testified to the conversation as follows:

> A: But he [Austin] had said that he was riding with him [Brandon] and that he took him to Hatchet Man Road. I'm not exactly sure what they were going to do, but, you know – Brandon started apologizing to him about an incident that happened while he was in juvey detention. And Austin told him, you know, 'There's no need to apologize. Pull over.' You know. Austin said he took him out of the car and he told him to be quiet, get on his knees. And he told him, you know, excuse my language, he said, 'Fucking look at me,' and when he looked at him he had shot him.
>
> Q: Okay. Did he say where he shot him at?
>
> A: At first he said he only shot him once and then he said twice. But he said right here and in the head.
>
> * * *
>
> A: And what did he tell you about Brandon's car?
>
> Q: He – he said he didn't know what to do with it. He was running out of gas. So he had just left it on the bike trail.

Q: And the bike trail is not too far from 713 Mason Street?

A: No, sir. Less than a mile.

Defense counsel elicited from Jessica that Austin had pointed behind his ear and the middle of his forehead when describing where he had shot Brandon.

{¶71} Hayle and Jessica later gave statements at the Warren Police Department. It was elicited from Hayle on cross-examination that she had told the detectives Austin's motive was to rob Brandon of a large amount of heroin:

> Austin had told us that he had known Brandon from DYS. Austin was part of the 82s, and Brandon was part of a Heartless Felon. Brandon was a CO officer. And I guess he had snitched on * * * Austin when he was in DYS or something like that. And Austin had told us that when he was walking down the road he had seen Brandon, asked for a ride. Brandon said he had to go drop somebody off. That he had gotten Austin, and that he wanted to rob him for what he had. And I believe it was only like 4 or 5 pounds of heroin. And that's even if so. I don't know.

{¶72} During the course of his investigation, Detective Greaver obtained a murder warrant for Austin on the morning of June 20, 2017. He instructed the 911 center to "ping" Austin's cell phone in an attempt to locate him. That night, dispatch reported to Detective Greaver that Austin's phone was "pinging" across the street from Pizza Joe's in Cortland, Ohio, which had just been robbed at gunpoint. Dispatch sent the detective a photo of a person who had been detained in Cortland and was giving the officers a false name. Detective Greaver recognized the man in the photo as Austin.

{¶73} Deidre testified that at 10:47 p.m. on June 20, she missed a call from Austin on Facebook messenger. She called him back at 10:50 p.m. and put him on speaker phone; Hayle was in the room. Austin told Deidre that he "came up on a bunch of money." He asked if he could come to the Mason Street house, but Mrs. Roupe would not allow it.

23

Hayle corroborated this account, and a screenshot from Deidre's phone with the call details was presented to the jury.

{¶74} Stephanie Kerstetter, the general manager of Pizza Joe's, testified that $775.00 was stolen the night of the robbery.

{¶75} Britni Williams, 18 years old at the time of trial, was working at Pizza Joe's in Cortland the night of June 20. She testified that as they were closing, a man came in demanding money with a small silver gun. Britni testified she was not able to see much of the man's face because he was wearing a ski mask. That night, Britni described the man as tall, wearing sweat pants and a hoodie. Defense counsel elicited that she did not notice any tattoos; Austin has tattoos on his face, neck, left hand, and left arm.

{¶76} Shawn Marx lives on West Main Street in Cortland, approximately 100 yards away from Pizza Joe's. He testified that on June 20 around 10:15 p.m. he was outside smoking a cigarette and saw a man run out of Pizza Joe's in his direction. The man was wearing dark clothing and was "shuffling around" behind a pickup truck approximately 20 feet away from Shawn under a street light. Shawn could see something shiny in the man's pocket, which he assumed was a pistol or something, but he could not see what it was. Shawn testified, "he took off some stuff and I could see his face. He looked at me, I looked at him, and he ran." He saw the man run across the street from Pizza Joe's in between a building and a house. When the police arrived, he told them the direction the suspect had ran. In his statement to police, Shawn described the man as having short dark hair, wearing blue jeans, tennis shoes, a red shirt, and carrying a sweatshirt. Shawn testified that he assumed the man was wearing blue jeans because it was "something

dark." He did not mention any tattoos to the police. At trial, Shawn identified Austin as the man he saw that night.

{¶77} Officer John P. Weston with the City of Cortland Police Department viewed multiple videotapes from the robbery at Pizza Joe's, which were also played for the jury. The videos show footage from behind Pizza Joe's where the suspect was located before the robbery; the suspect entering and leaving the restaurant from outside; and the actual robbery inside the restaurant. The suspect was a male wearing a dark hoodie, grey sweatpants, grey tennis shoes, and a mask of some sort. The video shows the suspect running towards the restaurant from across the street, entering at 10:08 p.m. (although the time stamp on the video is one hour behind). He was carrying a plastic grocery bag in his left hand, partially wrapped around the hand, and he pulled a small silver gun from the right pocket of the sweatpants, which left the pocket inside out. He visibly instructed the employees to place the money from the register in the grocery bag. Then he ran out. The entire robbery lasted little more than 30 seconds. The video then depicts the man running from the store, jogging across the parking lot, then walking across the street between a house and a building. He is not seen on the video removing any clothing.

{¶78} After being advised that the phone of a murder suspect with an active warrant was "pinging" in a building across the street from Pizza Joe's, the officers reported to an apartment in that building. There were a lot of people inside, and the officers asked each of them their name and birth date. Officer Weston testified that one man identified himself as "Nathan Novicky." Dispatch sent the Cortland officers a picture of Austin. The officers determined the name "Nathan Novicky" and the given birth date were false.

Detective Greaver, who was investigating Austin for murder, also confirmed for the Cortland officers that Austin was the man in the apartment.

{¶79} The Cortland officers interviewed each of the other young individuals present in the apartment that night: Leah Smith; Donavon Bunner; Stacie Cassidy; Justin Borawiec; and Melanie Engle, the leaseholder. They all testified at Austin's trial. At the time of trial, Leah was 15 years old; Donavon and Justin were 17; Melanie was 20; and Stacie was 23.

{¶80} During the day of June 20, 2017, the group was swimming at Willow Lake in Champion, Ohio. Another friend, Nick Goett, was also there, as was Austin. Melanie, Stacie, and Justin recently met Austin; he had told them his name was "Nathan." Leah and Donavon knew him as "Austin."

{¶81} When Willow Lake closed for the day, the group left in multiple vehicles and went to Melanie's apartment in Cortland. Late that evening, Melanie's cats escaped from the apartment; some remember it was one cat, others remember two. There was also not a consensus as to the exact time the cats escaped, but it was sometime between 9:00 and 10:00 p.m. Leah testified that she and Donavon went outside to look for the cats; Melanie and Donavon testified that everyone went outside to search.

{¶82} Leah, Donavon, and Stacie testified that they lost track of Austin while they were outside searching for the cats. Stacie said Austin was inside the apartment when she came back in, but she does not know where he was when she was outside. Donavon did not realize Austin had left but remembers him coming back to the apartment. Leah remembered Austin returning to the apartment with a lot of money in his hands; he was wearing grey sweatpants and a black hoodie. Leah did not ever tell the police that she

26

had seen Austin with money that night. Neither Donavon nor Stacie remember seeing Austin with any money.

{¶83} Justin testified that he did not go outside with the others to search for the cats. At some point, Justin testified, he did not know where Austin was. In his statement to the police that night, he indicated that Austin went to the bathroom; when Austin came back to the living room, the police arrived.

{¶84} Melanie testified that while everyone was searching for her cats, Nick became upset and decided to walk to Burger King, which was about a 10- to 15-minute walk from her apartment. At 9:58 p.m., Melanie received a text from her sister, who worked at Burger King, asking why Nick was there. A screenshot from Melanie's phone of this conversation was introduced as an exhibit. Melanie then drove to Burger King, waited while Nick finished eating, and drove him home to Vienna, Ohio. While she was gone, Melanie received a text from her mother that Pizza Joe's had just been robbed and to be careful. When Melanie returned to her apartment, the police were outside; they knocked on her door shortly thereafter. She also did not see Austin with any money.

{¶85} Leah and Donavon testified that they heard Austin give the false name of "Nathan," but they did not inform the police officers that it was not his real name.

{¶86} The state introduced a picture of Melanie, Leah, and Donavan with Austin. All three of them acknowledged it was taken some time during the day of June 20 at Melanie's apartment. Austin is wearing grey sweatpants in the picture.

{¶87} Detective Morris obtained written consent from Melanie to search the apartment, which was in a state of disarray. Officer Nicholas Mancini with the City of Cortland Police Department was present for the search. He and Officer Weston both

testified that the officers collected a pair of grey tennis shoes, a pair of grey sweatpants, and a plastic grocery bag. The shoes were found on the floor in the bedroom; the sweatpants and grocery bag were found in a laundry basket underneath a record album.

{¶88} According to their testimony, the grey tennis shoes appeared similar to those the robbery suspect was wearing because of white markings visible on the back. Inexplicably, one shoe was missing its shoelace. The grey sweatpants appeared similar to those worn by the suspect, and the right pocket was turned inside out as it had been in the video when the man pulled out the gun. The grocery bag also appeared similar to the one the man had wrapped around his left hand and then used to collect the money. The officers never located a dark hoodie or face mask.

{¶89} Austin was arrested on the active murder warrant, as well as for obstructing official business and failing to disclose his personal information. Officer Brandon Rice with the City of Cortland Police Department transported Austin to the police station and confiscated his cell phone.

{¶90} The next morning, June 21, Detective Greaver and his partner Mirandized and then interrogated Austin at the Trumbull County Jail regarding Brandon's death. Austin again told the detectives that Brandon had picked him up on June 11 around 7:30 p.m. while he was walking home from Willow Lake and that there was another person in the car. After Brandon dropped him off, Austin stayed at home. Austin also told the officers that he thought there were drugs in Brandon's car and that Brandon was taking his friend back to Akron after he dropped off Austin. He denied meeting up with Brandon later that night.

28

{¶91} The detectives obtained search warrants for DNA swabs from Austin and subpoenaed cell phone records from AT&T, Austin's wireless carrier. They also received Austin's cell phone and other physical evidence from the City of Cortland Police Department. Detective Greaver testified that he later attempted to subpoena cell phone records for Brandon's cell phone, but he did not receive a response from the carrier prior to trial.

{¶92} Detective Morris testified that he called and spoke to Nick Goett, the young man who had walked to Burger King the night of the robbery. Nick told the detective that he had been at Melanie's apartment on June 20, but he left prior to the robbery. Nick declined to appear at the police station to give a written statement. He did not testify at Austin's trial.

{¶93} Detective Morris returned to Melanie's apartment on June 21 to continue with the search. Finding nothing relevant, he left. Melanie's parents were at her apartment that day to move her back home, and they received permission to clean the apartment. Melanie's mother, Stephanie Taylor, testified that while she was cleaning, she discovered a small black bag with ammunition and a gun. Melanie had two vases filled with wooden flowers in the kitchen. Mrs. Taylor removed the flowers from one vase and discovered the heavy black bag. She squeezed it and determined there were bullets inside. Her husband went outside and told the officers what she had found. Mrs. Taylor removed the flowers from the other vase and saw the gun.

{¶94} Officer Mancini then discovered $545.00 inside an empty hair dye box in a blue grocery bag in the kitchen. Melanie testified that the bag had been used for trash in

her bathroom and she had moved it to the kitchen that morning when they were cleaning. She had not noticed the money inside.

{¶95} Detective Morris was called back to the apartment, where he collected the gun and ammunition pouch. It was a silver .22 caliber handgun with a marbled handle. A certified trace of the firearm revealed that it was a Taurus .22 caliber pistol. It had been purchased by and was registered to Jamie Lee Sell, Austin's mother. The prosecution entered the gun into evidence.

{¶96} On June 21, Detective Greaver was contacted by the mother of Austin's girlfriend Meredith. She provided the detective with a video she found on Meredith's cell phone, which depicted Austin shooting a small silver handgun. The video was played for the jury. Meredith testified that the video was taken before June 9, 2017, which is the day she left for a cruise.

{¶97} The prosecution also introduced two pictures it had recovered from Austin's cell phone. Meredith identified Austin in both pictures: one showed his face, and one showed the tattoos on his left arm and hand. In one picture, Austin is seen holding two handguns: one is small and silver with a marbled handle, the other is larger. The picture is overlaid with a caption that reads, "My two baddest bitches. And they loyal." In the other picture, Austin's tattooed left arm is visible; he is holding a small silver handgun with a marbled handle and wearing a pair of grey tennis shoes.

{¶98} Meredith admitted she had seen Austin with a small silver handgun that had marbled markings on the handle, but when asked if the gun presented at trial was the one she had seen Austin with, Meredith stated: "I don't know. It looked a little similar."

{¶99} To the contrary, many other trial witnesses positively identified the silver Taurus .22 pistol as the handgun they had seen Austin carry. Rickey, Nathan, Deidre, and Hayle all identified the gun. Hayle testified that Austin told her he had the gun at the Mason Street House on June 11. Deidre testified that she saw Austin with the gun at the Mason Street house a couple days prior to June 11. Nathan testified it was one of two guns he had seen Austin carry.

{¶100} Dan Lester Jr., a Lieutenant with the Trumbull County Sheriff's Office, testified that he is the administrator of the inmate phone call recording system at the Trumbull County Jail. After Austin was arraigned, he placed a phone call to his mother, the recording of which was played for the jury. In the recording, Austin's mother asks him if the gun was registered. Austin responds that he does not think it was registered. She later asks him if they will find his prints on the gun. Austin says he does not know what gun she is talking about and that she is saying too much on the phone about the case.

{¶101} Lynda Eveleth, a forensic scientist with BCI, testified as an expert in the area of DNA analysis. She collected DNA samples from the silver Taurus .22 and compared them with a known swab of DNA from Austin. She was unable to match Austin's DNA with any swab from the firearm. Her conclusion was that the DNA swab from the magazine indicated a mixture of DNA; an unknown male DNA profile was detected, but Austin was excluded as the major contributor. There was additional DNA detected, but it was insufficient to make a comparison. The DNA swabs from the trigger, ammunition, and other handled areas of the firearm were not suitable for comparison.

{¶102} Michael Roberts, a forensic scientist in the firearms department of BCI, determined the silver Taurus .22 was an LR caliber semiautomatic pistol. It was operable

31

at the time of testing. He also received a magazine and nine cartridges from the detectives, but there were no cartridge casings for comparison testing. Mr. Roberts examined the fragment recovered from Brandon's scalp that was initially believed to be a bullet fragment. During his analysis, however, he did not observe any "rifling." The item was off-white in color and nonmetallic, which is inconsistent with a bullet fragment. It also had hair on it. The origin of the fragment could not be determined.

{¶103} Joann Gibb, a computer forensic specialist with BCI, testified as an expert in the analysis of cell phones. On or about July 26, 2017, the Warren Police Department presented Ms. Gibb with Austin's cell phone for analysis. Using software, Ms. Gibb was able to produce the phone's text message and call history. Ms. Gibb was asked to find any contact between Brandon's number and Austin's number on June 11 and 12, 2017.

{¶104} A printout of an extraction report was introduced with a history of texts and calls to and from Brandon's number, designated with the name "B Samps," on June 11 through June 13, 2017. According to Josh's testimony, "B Samps" was Brandon's nickname.

{¶105} Brandon called Austin at 8:26 p.m. on June 11; the call was only connected for 2 seconds. Between 10:01 and 10:23 p.m. on June 11, the two exchanged texts indicating they were trying to get together that night after Brandon dropped Josh off in Akron. Each of these texts had been deleted from Austin's phone, but Ms. Gibbs was able to recover them. Austin called Brandon at 1:18 a.m. on June 12; the call lasted 43 seconds.

{¶106} There was no more contact between the two phone numbers until June 13, after Brandon had been reported missing. Austin texted Brandon three times. There

were no responses from Brandon's phone.  These three texts had not been deleted from Austin's phone:

> Yo, is you straight n---- you're all over facebook!? Wtf hmu

> Turner and someone named stephanie hmu askin if I seen you and my names in your missing photos I can't be having this kinda attention dawg if youre hiding or you O.D on some boii ima be fucking pissed

> Bro!?!?!?

{¶107} The prosecution also introduced an extraction report produced by Ms. Gibb with a history of texts between Austin and Brittani Merten on June 12.

{¶108} Brittani, who was 18 years old at the time of trial, testified that she knew Austin through her brother, Nathan Moats.  She had seen Austin with a small "blue like marble" firearm at her apartment in June 2017.  A little after midnight on June 12, Austin sent Brittani a text that read, "see if my clip for the 9mm is out there."  Brittani testified that Rickey and Nathan had been "playing" with one of Austin's guns that was "a little bigger than the other one" she had previously described, and they had lost the clip.  Brittani responded to Austin that she did not see the clip anywhere.  Later, Brittani asked Austin where he was, and at 2:08 a.m. on June 12, Austin texted Brittani that he was in Niles.  According to Detective Greaver, he had contacted Brittani during the investigation, but she did not have any information regarding Brandon.

{¶109} William Moskal, a criminal intelligence analyst with BCI, testified about "cell site mapping," which is the process of using information obtained from cellular companies to map the towers that are associated with phone calls and texts.  Detective Greaver asked Mr. Moskal to analyze the cell site data obtained from AT&T regarding Austin's phone for June 12 beginning at midnight.  The data had been obtained from AT&T via

Grand Jury Subpoena. The prosecutor introduced into evidence the cell phone records obtained from AT&T and two reports generated by Mr. Moskal.

{¶110} One report shows a map of cell site location information when Austin's phone was used to send a text or make a phone call: e.g., it indicates the date and time; the length of a call; the number called or texted; and the applicable cell tower. It does not show the exact location of the phone, merely the location of the cell tower to which the phone connected. AT&T refers to this report as "AU."

{¶111} The other report shows a map indicating where and when Austin's phone "pinged" a cell tower, even if the phone was not being used at the time. The "pings" are often random; the information is used internally by AT&T for network distribution purposes. AT&T refers to this report as "NELOS." This report was the subject of Austin's motion to suppress: it provides the Historical Precision Location Information ("HPLI").

{¶112} Mr. Moskal mapped the locations of where Brandon's body was found on Peck Leach Road in Bristol (labeled "body location"), where Austin lived in Bristol (labeled "5106 Miller South Road, Bristolville"), where Brandon's car was found on the bike path in Niles (labeled "location of victim's car"), and the Mason Street house in Niles (labeled "713 Mason Street").

{¶113} The cell site data from the AU and HPLI/NELOS reports indicate that Austin's phone connected to or "pinged" off of AT&T cell towers in the following locations the early morning of June 12, 2017:

- 12:09 a.m. – Bristol near 5106 Miller South Road (AU)
- 1:18 a.m. – Bristol northeast of 5106 Miller South Road (AU)
- 2:08 a.m. – Niles near the location of victim's car and 713 Mason Street (AU)
- 3:46 a.m. – the city of Warren (AU)

34

- 4:51 a.m. – Bristol between 5106 Miller South Road and the body location (HPLI/NELOS)
- 4:53 a.m. – Bristol near 5106 Miller South Road (HPLI/NELOS)
- 5:14 a.m. – Bristol between 5106 Miller South Road and the body location (AU)
- 5:41 a.m. – the city of Warren (HPLI/NELOS)
- 9:57 a.m. – Niles near the location of victim's car and 713 Mason Street (HPLI/NELOS)
- 10:57 a.m. – Niles near the location of victim's car and 713 Mason Street (HPLI/NELOS)
- 11:57 a.m. – Bristol near 5106 Miller South Road (AU)

**{¶114}** Finally, Timothy Cook testified that he was an inmate at the Trumbull County Jail when Austin was there in June and July 2017. He overheard Austin tell another inmate that "he shot him, it didn't seem real because there wasn't that much blood. But he said he did it." Timothy contacted the Warren Police and gave a statement. Timothy testified that he offered the statement hoping to receive a benefit, but none of his charges were dropped, he was not released from jail, and he did not receive a reduced sentence. Timothy stated he was "forced" to provide his testimony at Austin's trial.

**Motion to Sever**

**{¶115}** Under his second assignment of error, Austin argues the trial court erred in failing to sever for trial the offenses related to the armed robbery from the offenses related to the homicide.

**{¶116}** "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). However, even when two or more offenses are properly charged

in the same instrument under Crim.R. 8(A), it may be necessary to order separate trials under Crim.R. 14. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶20.

**{¶117}** "'The law favors joining multiple criminal offenses in a single trial.' *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). This is because joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.' *Bruton v. United States*, 391 U.S. 123, 134 (1968)." *Id.* at ¶18. Permitting joinder also "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158 (1988) (citation omitted).

**{¶118}** "'Notwithstanding the policy in favor of joinder,' Crim.R. 14 permits a defendant to request severance of the counts in an indictment 'on the grounds that he or she is prejudiced by the joinder of multiple offenses.'" *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶44, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶49. "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * * in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, * * * or provide such other relief as justice requires." Crim.R. 14.

**{¶119}** "The defendant 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *Clinton*, *supra*, at ¶44, quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). "But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could

36

have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B) or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163 (1990).

{¶120} Prior to trial, Austin sought severance pursuant to Crim.R. 8(A) and relief from prejudicial joinder pursuant to Crim.R. 14. Relevant to his assignment of error, he requested separate trials for (1) the charges that arose from the shooting death of Brandon on or about June 12, 2017, and (2) the charges that arose from the armed robbery at Pizza Joe's on June 20, 2017. Defense counsel renewed the motion to sever at the close of the state's case-in-chief and again raised the issue in a motion for new trial.

{¶121} Austin argued the offenses were misjoined under Crim.R. 8 because the crimes were not of the same or similar character, were not of the same act or transaction, and were not connected as part of a common scheme or course of criminal conduct. Alternatively, he argued severance was necessary under Crim.R. 14 because he would suffer extreme prejudice in that evidence of each crime would be inadmissible in the trial of the other and, because the evidence is not simple and direct, a joint trial would create confusion and unnecessary complexity.

{¶122} The state responded that the evidence was simple and direct with regard to all counts and that Austin failed to make a showing of actual prejudice. It maintained the charges all stemmed from the same transaction and were part of a larger course of criminal conduct, and the facts were "straight-forward, uncomplicated, and interrelated." "In fact," the state asserted, "the defendant made admissions to witnesses regarding the Aggravated Murder and then made admissions to some of the same people after the

37

robbery stating he had gotten a lot of money." Further, the state reasoned, the court could provide a limiting instruction to the jury.

{¶123} The trial court summarily denied relief at each juncture.

{¶124} "We review a trial court's ruling on a Crim.R. 14 motion for an abuse of discretion." *Clinton*, *supra*, at ¶46, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶166. An "abuse of discretion" occurs when a trial court fails "'to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.2004).

{¶125} "A defendant who appeals the denial of relief bears a heavy burden:

> 'He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.'

*Clinton*, *supra*, at ¶46, quoting *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992).

{¶126} The disagreement on appeal centers around whether the evidence of each crime joined at trial was "simple and direct."

{¶127} "Simple and direct" has become an often-undefined catchphrase in judicial opinions. It stems from the concept that joinder of unrelated offenses is not prejudicial when the evidence as to each is not weak, is direct and uncomplicated, and can reasonably be separated as to each offense. *See State v. Torres*, 66 Ohio St.2d 340, 343-344 (1981), citing *United States v. Ragghianti*, 527 F.2d 586 (9th Cir.1975) and *United States v. Catena*, 500 F.2d 1319 (3d Cir.1974). In other words, the "simple and direct" test is satisfied when the evidence is sufficient to sustain each verdict, regardless of whether the charges were tried together, and when the jury will not be, or has not been,

confused as to which evidence proves which act. *See id.*, citing *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980); *see also State v. Coley*, 93 Ohio St.3d 253 (2001).

{¶128} As the venerable Judge Learned Hand explained:

> There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition. Yet in the ordinary affairs of life such a disposition is a convincing factor, and its exclusion is rather because the issue is practically unmanageable than because it is not rationally relevant. When the accused's conduct on several separate occasions can properly be examined in detail, the objection disappears, and the only consideration is whether the trial as a whole may not become too confused for the jury.

*United States v. Lotsch*, 102 F.2d 35, 36 (2d Cir.1939).

{¶129} Here, although joining offenses for trial always carries a risk of prejudice, we conclude Austin has not affirmatively demonstrated that his rights were prejudiced by the joinder of these offenses for trial. The evidence as to each charge was uncomplicated: there were no competing expert witnesses for the jury to unravel, and there was minimal scientific evidence with which the jury had to contend. Additionally, the relevant evidence as to each event was not generally overlapping and was easy to separate. With the exception of the coroner, the witnesses related to the events of June 12, 2017, were called prior to the witnesses related to the events of June 20, 2017. A few witnesses had testimony relevant to both dates, but, again, questions were asked of them in chronological order.

{¶130} Further, the trial court admonished the jury to consider each offense as "separate and distinct." It instructed the jury, in relevant part, as follows:

39

[T]he charges set forth in each count of the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count. The defendant may be found guilty or not guilty of any one of the offenses charged.

{¶131} There is no reason for this court to believe that the jury did not heed these instructions or that the trial, as a whole, became too confused for the jury. Austin has not established on appeal that the trial court, given the information provided, abused its discretion in refusing to separate the charges for trial.

{¶132} The second assignment of error is without merit.

**Manifest Weight**

{¶133} In his third assignment of error, Austin maintains his convictions are against the manifest weight of the evidence.

{¶134} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997) (emphasis added), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

> 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'

*Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a '"thirteenth juror"' and disagrees with

40

the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457

U.S. 31, 42 (1982).

{¶135} To convict Austin of the charged offenses, the state was required to prove

the following elements beyond a reasonable doubt:

> *Aggravated Murder*: On or about June 12, 2017, Austin did purposely cause the death of Brandon, while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery. R.C. 2903.01(B).
>
> *Aggravated Robbery*: On or about June 12 and June 20, 2017, in attempting or committing a theft offense as defined in R.C. 2913.01, or in fleeing immediately after the attempt or offense, Austin did have a deadly weapon on or about his person or under his control, and either displayed the weapon, brandished it, indicated he possessed it, or used it. R.C. 2911.01(A)(1).
>
> *Tampering with Evidence*: Knowing that an official proceeding or investigation is in progress, or is about to be likely to be instituted, Austin did alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation. R.C. 2921.12(A)(1).
>
> *Having Weapons While Under Disability*: On or about June 12 and 20, 2017, having not been relieved from disability under operation of law or legal process, Austin did knowingly acquire, have, carry, or use any firearm, when he had been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence, to-wit: aggravated burglary with a firearm specification. R.C. 2923.13(A)(2).
>
> *Firearm Specifications*: At the time of committing Aggravated Murder and both Aggravated Robberies, Austin did have a firearm on or about his person or under his control and brandished the firearm, indicated that he possessed it, or used it to facilitate the offense. R.C. 2941.145.

{¶136} Austin asserts there was a lack of forensic evidence supporting his

conviction for aggravated murder. Although there was no DNA or firearm evidence

41

connecting Austin to the crime, there was forensic evidence in the form of the HPLI cell tower data.  As discussed above, that data was properly before the jury.

{¶137} Austin further maintains the witness testimony was unforgivably inconsistent and contradictory.  The jury was in the best position to consider the certainty and reliability of the young witnesses' testimony.  Some witnesses did conflict as to specific times or details at issue, but the information provided and the general time frames established by the testimony provided a generally consistent timeline of events on the days in question.  It was revealed that a few of the teenage witnesses had initially lied to the police about what they knew, either in an effort to protect Austin or because they were scared of Austin.  However, the record does not reveal any incentive the witnesses may have had to provide testimony against Austin's interests, perhaps except for fellow inmate Timothy Cook.  Further, it is understandable that there may be slight discrepancies between the teenagers' trial testimony and statements they made in a stressful situation that had occurred nine months prior.

{¶138} The cell phone data was admissible, reliable, and certain.  Austin's actions in deleting text messages, lying to the police about his whereabouts, and making admissions to his friends are all indicative of guilt.  He told multiple witnesses where he left Brandon's body.  After this information was given to the police, that is precisely where the body was found.  The witness testimony, although at times inconsistent, provided direct evidence of identity, motive, plan, intent, opportunity, and means.  We conclude the jury did not lose its way in resolving conflicts in the evidence, nor did it create a manifest miscarriage of justice in rendering verdicts of guilty.  Austin's convictions are not against the manifest weight of the evidence.

**{¶139}** The third assignment of error is without merit.

## Cumulative Error

**{¶140}** In his fourth assignment of error, Austin argues that cumulative errors committed by the trial court, even if determined to be harmless, require a reversal of his convictions under the cumulative error doctrine.

**{¶141}** The Ohio Supreme Court recognized the doctrine of cumulative error in *State v. DeMarco*, 31 Ohio St.3d 191 (1987), at paragraph two of the syllabus: "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." Application of the doctrine is not limited to violations of the Rules of Evidence, as is evident in *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶257 (citations omitted): "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial, even though each of the numerous errors does not individually constitute cause for reversal."

**{¶142}** Austin made multiple admissions to multiple witnesses. He received a fair trial, and we concluded that his above assignments of error are without merit. Therefore, the doctrine does not call for reversal in the case sub judice.

**{¶143}** The fourth assignment of error is without merit.

## Sentence in Case No. 2017 CR 541

**{¶144}** An appellate court generally reviews felony sentences under the standard of review set forth in R.C. 2953.08(G)(2):

The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

"Under this standard, an appellate court upholds the imposed felony sentence unless: (1) required mandatory findings are clearly and convincingly not supported by the record; or (2) the sentence is clearly and convincingly contrary to law." *State v. Aldrich*, 11th Dist. Ashtabula No. 2017-A-0033, 2017-Ohio-8944, ¶32 (citations omitted); *see also State v. Wilson*, 11th Dist. Lake No. 2017-L-028, 2017-Ohio-7127, ¶18, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶23.

{¶145} Austin's final assignment of error relates to case No. 2017 CR 521. He challenges the trial court's imposition of a maximum 11-year sentence for possessing a deadly weapon while under detention, a first-degree felony, which was ordered to run consecutive to the sentences imposed in case No. 2017 CR 403.

{¶146} Austin challenges the consecutive nature of the sentence. However, the trial court was required, as a matter of law, to order any sentence imposed for this charge, a felony violation of R.C. 2923.131, to run consecutively to the sentence imposed in case No. 2017 CR 403. Thus, this argument is not well taken. *See* R.C. 2929.14(C)(2) ("if an

44

offender who is under detention at a detention facility commits a felony violation of section 2923.131 of the Revised Code, * * * any prison term imposed upon the offender for one of those violations shall be served by the offender consecutively to the prison term or term of imprisonment the offender was serving when the offender committed that offense and to any other prison term previously or subsequently imposed upon the offender").

{¶147} Austin also claims imposition of the maximum allowable sentence is contrary to law because "the major justification" was his murder conviction, which, as he maintains, was invalid. This argument is also not well taken. The trial court never indicated that "the major justification" for the length of the sentence was Austin's murder conviction. The trial court stated it had considered the overriding principles and purposes of felony sentencing and all relevant seriousness and recidivism factors, pursuant to R.C. 2929.11 and R.C. 2929.12. *See State v. DelManzo*, 11th Dist. Lake No. 2007-L-218, 2008-Ohio-5856, ¶23 ("[a] trial court is not required to give any particular weight or emphasis to a given set of circumstances; it is merely required to consider the statutory factors").

{¶148} The trial court further declared it had reviewed the presentence investigation report prepared for case No. 2017 CR 403 and, directly addressing Austin, stated: "Mr. Burke, I've reviewed your presentence investigation. Based on your criminal history as a juvenile, an adult, and your record at the jail, and all the things you've done, this Court sees you -- not any redeeming social value for you in any way, shape or form."

{¶149} Notwithstanding the murder and multiple other convictions in case No. 2017 CR 403, the presentence investigation report confirms that Austin has an extensive criminal history. Also, in addition to possessing the improvised knife/shank while under

45

detention for case No. 2017 CR 403, Austin's record of behavioral issues in the jail includes an apparent escape attempt.

**{¶150}** Austin has failed to demonstrate that his sentence in case No. 2017 CR 541 is clearly and convincingly contrary to law. Thus, his fifth assignment of error is without merit.

## Sentence in Case No. 2017 CR 403

**{¶151}** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Although not brought to our attention on appeal, this court notes, sua sponte, that the March 27, 2018 sentencing entry and the April 11, 2018 nunc pro tunc sentencing entry in case No. 2017 CR 403 contain plain errors that may be corrected by the trial court nunc pro tunc.

**{¶152}** Pursuant to R.C. 2929.14(C)(4), the trial court must find that consecutive service "is necessary to protect the public from future crime or to punish the offender." The trial court must also find that consecutive sentences "are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* The trial court must further find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

46

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Id.* A trial court's failure to make the R.C. 2929.14(C)(4) findings at the sentencing hearing renders the sentence contrary to law, "requiring the vacation of the sentence and a remand to the trial court for resentencing." *State v. Aikens*, 11th Dist. Trumbull No. 2014-T-0124, 2016-Ohio-2795, ¶61, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶37. However, "a trial court's failure to incorporate the findings required by R.C. 2929.14(C) in the sentencing entry after making those findings at the sentencing hearing does not render the sentence contrary to law" and may be corrected via a nunc pro tunc entry. *Id.*, citing *Bonnell*, *supra*, at ¶30.

{¶153} The record reflects the trial court made the requisite findings at the sentencing hearing, stating: "It is necessary to punish the defendant and protect the public and not disproportionate, as the offender's criminal history shows that consecutive sentences are necessary to protect the public." The trial court, however, failed to incorporate the finding under R.C. 2929.14(C)(4)(c) in its sentencing entry, merely writing: "the Court finds that consecutive service is necessary to protect the public from future crime and to punish the Defendant, and that consecutive sentences are not disproportionate to the seriousness of the Defendant's conduct and to the danger the Defendant poses to the public." The fact that it is Austin's *criminal history* that demonstrates consecutive sentences are necessary to protect the public is the portion that was omitted.

{¶154} Therefore, we remand this matter for the trial court to issue a nunc pro tunc sentencing entry, incorporating the R.C. 2929.14(C)(4)(c) finding that was made at the

47

sentencing hearing. *See, e.g., State v. Olp*, 11th Dist. Ashtabula Nos. 2015-A-0033 & 2015-A-0034, 2016-Ohio-3508, ¶19; *State v. Stewart*, 11th Dist. Trumbull No. 2017-T-0063, 2018-Ohio-1678, ¶16-24; and *State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶108-112.

**{¶155}** Finally, we note that the sentencing entries in case No. 2017 CR 403 incorrectly state that Austin's convictions for aggravated robbery included forfeiture specifications. This should also be corrected, nunc pro tunc, to reflect that Austin's convictions for aggravated robbery included firearm specifications, as was reflected in the indictment, jury instructions, and jury verdict forms.

## Conclusion

**{¶156}** The judgment of the Trumbull County Court of Common Pleas in case No. 2017 CR 541 is hereby affirmed.

**{¶157}** The judgment of the Trumbull County Court of Common Pleas in case No. 2017 CR 403 is hereby affirmed. The matter is remanded for the trial court to enter a nunc pro tunc sentencing entry consistent with this opinion.


MATT LYNCH, J.,

MARY JANE TRAPP, J.,

concur.